2023 IL App (4th) 220476

NO. 4-22-0476

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 1, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| ERIC L. BROWN, | ) | No. 19CF3386 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Ronald J. White, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Harris and Lannerd concurred in the judgment and opinion.

**OPINION**

¶ 1        Following a jury trial, defendant, Eric L. Brown, was found guilty of one count of being an armed habitual criminal (AHC) (720 ILCS 5/24-1.7(a) (West 2018)). The trial court sentenced defendant to 20 years' imprisonment. Defendant appeals, arguing that the court abused its discretion by failing to order supplemental discovery and by failing to strike a witness's testimony. Defendant further argues that the court imposed an improper double enhancement in sentencing him. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3        In December 2019, defendant was charged with being an AHC (720 ILCS 5/24-1.7(a) (West 2018)) and two counts of possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2018)). The charges stemmed from a November 6, 2019, traffic stop, during which the police forced defendant to the ground face-down and, after rolling defendant to his side,

found a handgun underneath him. The State ultimately dismissed both counts of possession of a weapon by a felon and proceeded only on the AHC count.

¶ 4 In February 2020, the State filed a motion *in limine* seeking to admit a recording of a November 7, 2019, phone call defendant made to an unidentified individual while in the Winnebago County jail. The State asserted that, on the call, defendant "proceeds to talk about how the police did not say anything about the 'tough' or 'tug' (speaking in code) and that it was 'on me on me [*sic*].' " The State asserted that "a sufficient foundation for the recording may be laid by Winnebago County Jail staff reference [*sic*] the [Global Tel Link (GTL)] inmate telephone call system, inmate usage, recording capability and accuracy, warnings, proper operation and preservation of the recordings." The State also noted that it would call Detective Scott St. Vincent, who participated in the November 6, 2019, arrest and interview of defendant and who could "testify as to his familiarity with the defendant's voice and that the declarant on the phone call is the defendant." The record shows that St. Vincent had known defendant for over 10 years. St. Vincent had conducted off-duty security work for a high school defendant attended, where they "had numerous encounters." St. Vincent also had encounters with defendant in 2011, 2017, and 2019 while working as a patrol officer.

¶ 5 The trial court considered the State's motion *in limine* on the morning of trial, February 15, 2022. At that time, the State informed the court that Detective Johnathan Deutsch of the Rockford Police Department would identify defendant's voice in the recording of the November 7, 2019, phone call. The court replied, "Oh, then we have to have a hearing." Defendant's counsel noted, "that has not been disclosed to me, that Detective Deutsch was gonna testify to that." Counsel explained that she believed the State had planned to associate defendant with the call by presenting evidence that defendant's inmate account personal identification

number (PIN) matched that of the caller on the recording. The State responded that the "defense did have notice," as the State noted in its motion *in limine* that it sought to admit the recording "through a correctional officer by the PIN" while also laying a "foundation for Detective St. Vincent to testify about his familiarity with the defendant's voice." Defendant's counsel replied that it had not been disclosed that Deutsch would be providing the voice-identification testimony and that she "did not speak to Detective Deutsch about this because it was not disclosed to [her]."

¶ 6    Thereafter, Deutsch was examined outside the presence of the jurors and testified to the following. Deutsch first had contact with defendant in 2014 and spoke with him for 5 to 10 minutes "on a warrant service." Deutsch also spoke with defendant for 5 to 10 minutes on November 6, 2019, after defendant was taken into custody following the traffic stop, to obtain his personal information. Deutsch testified that prior to that 2019 conversation, he had listened to "probably 50 to 100" jail phone calls and was able to identify defendant's voice on those calls. Deutsch asserted that he had also listened to a jail phone call associated with defendant's inmate account PIN that had taken place at 7:36 p.m. on November 7, 2019. Deutsch testified that defendant was one of the individuals on that call. A recording of the November 7 phone call was marked as exhibit 14 and played in court. On cross-examination, Deutsch testified that he "believe[d]" he had a report pertaining to defendant's 2014 arrest. Deutsch further testified that he identified defendant on the phone calls he listened to "[b]ased on [defendant's] voice" and also because the calls were "made from his PIN number." Deutsch noted that he knew defendant's voice because it was "unique" and "a little higher pitched," though Deutsch acknowledged that he had no training or expertise in voice identification. On redirect examination, Deutsch agreed that the November 7, 2019, phone call had a voice of the same tone and tenor as the jail phone calls he had previously listened to involving defendant.

¶ 7 The State argued that a sufficient foundation was laid for Deutsch to testify that defendant was on the November 7, 2019, phone call. Defendant's counsel responded that Deutsch was not an expert in voice identification and that the State had an obligation to "disclose this report from 2014" in order to verify that a conversation occurred between Deutsch and defendant. To that end, counsel asserted that she was "making a motion for disclosure of that report." Counsel also argued that Deutsch's exposure to defendant was only "twenty minutes over a period of five years, and then the rest is an assumption based upon a PIN." Additionally, counsel contended that "[t]his is late disclosure of Detective Deutsch being able" to identify defendant's voice. Counsel explained that, because she did not have access to the 50 phone calls Deutsch listened to, she could not thoroughly investigate whether defendant had been on any of those calls. Accordingly, as to Deutsch's voice-identification testimony, counsel argued that she "d[id]n't think that it should be allowed." Counsel further argued that the court should "keep this jail phone call away from the jury."

¶ 8 The trial court ruled that Deutsch would be permitted to identify defendant's voice in the phone call, should the proper foundation for the call be laid. Defendant's counsel then interjected, "I'm gonna need those 50 phone calls," commenting that "this is all surprise, day of trial." In explaining its ruling, the court stated,

> "it appeared to me initially that Detective Deutsch only spoke to defendant in 2014 and then had a conversation on November 6, 2019. If that was the only case, I don't know whether or not I'd let it in. But we now have conversations between—that Detective Deutsch listened to over a period of time, 50 to 100 phone calls."

Defendant's counsel expressed her concern that she could not confirm that defendant was on the 50 to 100 calls Deutsch was relying on and commented, "the Court would not have let these jail

- 4 -

phone calls come in if it came down to just two conversations." The court responded, "I'm gonna say perhaps. I'm not saying exactly."

¶ 9 At trial, the State called Steve McCorkle, who testified to the following. McCorkle was a sergeant at the Winnebago County Correctional Facility. His duties included fulfilling subpoenas and requests from attorneys for inmates' phone calls. The inmate jail phone call system was operated by GTL, a third-party provider. McCorkle had training on the phone system when it was installed by GTL. McCorkle explained that, when inmates are first booked into the jail, they receive a randomly generated PIN. The first time an inmate makes a phone call, he or she must register a voice-biometric phrase, which was a security feature that ensured that the person on the call was the correct inmate using the proper PIN. In order to make a phone call, the inmate must enter his or her PIN and provide the associated voice-biometric phrase. If the person making the call did not match the registered voice biometric, the call would not go through. Defendant raised no objection to McCorkle's testimony regarding voice biometrics. McCorkle testified that every phone call was recorded and stored offsite on a GTL server. He had the credentials and security clearance to access the recordings. To obtain calls, he would go to a web-based application provided by GTL, input his credentials, and enter a query for the requested calls by date range and PIN number. McCorkle used that process to obtain the November 7, 2019, phone call, which was admitted into evidence.

¶ 10 On cross-examination, the following exchange occurred between defendant's counsel and McCorkle:

> "Q. [DEFENSE COUNSEL] Okay. And is it true that on occasion there are inmates who use other people's PINs and are able to access the phones and make phone calls?

A. [McCORKLE] They can try, but the voice biometrics tends to block that.

Q. Tends but not always. Is that fair?

A. That's fair.

Q. So the voice biometrics is not foolproof.

A. It's pretty bulletproof, but everything—you know, anything electronic can have issues.

Q. You're aware that inmates have been able to use other inmate's PINs?

A. It's happened, but the voice biometrics continuously checks and it will hang up a call."

¶ 11 Following McCorkle's testimony, the parties spoke with the trial court outside the presence of the jury. Defendant's counsel argued that McCorkle provided expert testimony about the voice-identification system being bulletproof, and the defense had not received any report. After counsel acknowledged that the State had provided McCorkle's name to her before trial, the trial court responded that counsel "had an opportunity *** to speak with McCorkle before this."

¶ 12 The State then called Deutsch, who testified to the following. On the morning of November 6, 2019, an anonymous caller informed dispatch that defendant was at an apartment located on Harrison Avenue in Rockford. Deutsch knew that defendant had an active arrest warrant. Deutsch rode with Detective Brandon Pofelski to the apartment in an undercover van. They surveilled the apartment from the van while Detectives St. Vincent and Ryan Marko surveilled from their respective vehicles. Deutsch observed two black females and defendant exit the apartment toward a Toyota Camry in the parking lot. One female got into the driver's seat of the Camry, while the other female got into the front passenger seat. Defendant got into the back passenger seat. When the Camry left the parking lot, all three police vehicles pursued it. The

detectives positioned their vehicles to box in the Camry while it was moving. The detectives slowed their vehicles, forcing the Camry to stop. Deutsch exited his van and ran to the rear passenger seat of the Camry. Deutsch opened the door and saw defendant next to a laundry tote. Defendant's torso was partially concealed with clothing and household items. Deutsch grabbed defendant and pulled him from the Camry "right to the ground." Deutsch and Pofelski then handcuffed defendant and rolled him to his side. When they did so, they observed a .40-caliber Beretta underneath defendant that was not on the ground when they had approached. Deutsch looked in the Camry and saw household items inside of it. It looked "as if they were moving."

¶ 13        Deutsch testified that he had a 5-to-10-minute conversation with defendant in 2014 and that they spoke again for 5 or 10 minutes during the November 6, 2019, stop. Additionally, Deutsch noted that he had listened to phone calls placed by inmates at the Winnebago County jail, including a November 7, 2019, call made with a PIN associated with defendant. The State played exhibit 14 over defendant's objection. No transcript of the call was introduced into evidence. From this court's review of the recording, a male voice seemingly mentioned that a "tough" or "tug" was "on me, on me [*sic*]." Deutsch identified the individual who made that comment as defendant, though Deutsch acknowledged that he was not an expert on voice identification.

¶ 14        Following Deutsch's testimony, the court recessed. The next morning, defendant's counsel filed a motion to strike McCorkle's testimony. The defense asserted that the State never disclosed that McCorkle would testify about voice-imprint technology or that the jail phone system was "bulletproof" in its ability to match inmates with their associated PINs. The parties argued the motion outside the presence of the jury. The trial court believed Deutsch testified as an expert, as his testimony about the operation of the jail phone system was not "common knowledge." The

court noted, however, that McCorkle also testified that it was possible that someone could use the phone with somebody else's PIN. Accordingly, the court denied defendant's motion.

¶ 15        Testimony by Pofelski and Marko about the stop and arrest of defendant largely mirrored Deutsch's, with the following additions. Pofelski testified that he looked into the Camry when the detectives stopped it and saw that clothing and other items partially covered defendant's body. The items in the vehicle led Pofelski to conclude that the individuals in it were moving. Pofelski testified that as Deutsch started pulling defendant out of the Camry, Pofelski noticed that defendant kept his left arm "real tight towards the waistband area of the body." Pofelski then grabbed defendant's arm to pull it back until the detectives could handcuff him on the ground. When defendant was pulled out of the vehicle, Pofelski did not hear a gun fall to the pavement or observe anything pulled out of the vehicle with defendant. Pofelski testified that, once they rolled defendant to his side, they found a black handgun on the ground where defendant's waist had been.

¶ 16        Marko similarly testified that the detectives observed a firearm underneath defendant after they rolled defendant to the side. Marko acknowledged that he knew the female driver of the Camry because she was a waitress at a restaurant that he routinely visited. Marko testified that he had talked with the driver at the restaurant, and during their conversations, the driver had noted that her sons had been arrested "for gun cases."

¶ 17        Following Marko's testimony, the State introduced certified copies of defendant's 2015 and 2018 convictions for unlawful use or possession of a weapon by a felon (UUWF).

¶ 18        During closing argument, the prosecutor explained that she did not know what a "tug" was and that it was for the jury to decide. The prosecutor argued, however, that at the time of the call on November 7, 2019, defendant had not yet been charged with any weapons offenses.

The prosecutor mentioned that defendant stated that the police had not said anything about the "tug" and that he had it "on me, on me [*sic*]."

¶ 19   During the jury's deliberations, the jury sent notes asking whether there was a written transcript of the November 7, 2019, phone call and whether the jury could listen to the call. The court responded that there was no transcript and that the jurors had to rely on their memory of the call.

¶ 20   The jury found defendant guilty of being an AHC. At sentencing, defendant's counsel objected "to the Court considering in aggravation anything that is alleged in the indictment." The trial court overruled counsel's objection, noting, "It is his prior record. That had to be proved up at the trial and I have to consider it because it is part of the record." In sentencing defendant, the court noted that it considered the presentence report. The court explained:

> "[D]efendant has a history of prior delinquency and criminal activity. The defendant had no juvenile record. All of a sudden he picks up some serious cases as an adult. The defendant has a prior conviction from June 29, 2012, four years and six months Illinois Department of Corrections for possession of a stolen firearm. I understand [defense counsel]'s objection, but I do believe it's proper for the Court to consider his prior record on the sentencing in this [AHC] because those offenses were proved up as part of the elements before the jury, but I can consider those in sentencing. The defendant has a second [UUWF], a Class 2, three years Department of Corrections on December 12, 2015. And then, finally, we have [a UUWF], a Class 2. The date of the offense, of the judgment of conviction was June 29, 2018, four years Department of Corrections, and then the defendant is on parole or mandatory supervised release at this time. You have a serious, serious criminal

record regarding possession of weapons. And I do believe this sentence is necessary to deter others from committing the same offense."

The court further noted that it believed defendant's conduct was the result of circumstances likely to reoccur and that defendant's character and attitude indicated that he was likely to commit another criminal offense. Given the "history, character, and condition of the defendant," and "for the protection of the public," the trial court sentenced defendant to 20 years' imprisonment. This appeal follows.

¶ 21                                    II. ANALYSIS

¶ 22        On appeal, defendant argues that the trial court abused its discretion by failing to order supplemental discovery of the jail phone calls Deutsch relied on in concluding that the voice on the November 7, 2019, phone call was defendant's. Defendant also argues that the trial court abused its discretion by failing to strike McCorkle's testimony regarding the voice-biometrics feature of the jail phone system and how it was "bulletproof" because (1) such testimony was expert testimony and (2) the State did not disclose McCorkle's expert witness qualifications. Finally, defendant argues that the court imposed an improper double enhancement by considering defendant's predicate felonies for the offense of AHC as an aggravating sentencing factor.

¶ 23            A. Supplemental Discovery of Additional Jail Phone Calls

¶ 24        Defendant argues that the trial court abused its discretion in failing to grant supplemental discovery of the 50 to 100 jail phone calls Deutsch mentioned. Defendant contends that the State engaged in surprise tactics by informing the defense on the morning of trial that Deutsch, not St. Vincent, would lay the foundation for exhibit 14 and identify defendant's voice. Defendant argues that, as a result, his counsel was unable to prepare an adequate defense. According to defendant, since the phone calls Deutsch relied upon were never disclosed, defense

counsel was unable to examine Deutsch adequately and challenge the admission of exhibit 14 or Deutsch's voice-identification testimony.

¶ 25     The denial of a discovery motion in a criminal case is reviewed for an abuse of discretion. *People v. Sims*, 2022 IL App (2d) 200391, ¶ 97. An abuse of discretion occurs only when (1) the trial court's ruling is arbitrary, fanciful, or unreasonable; (2) no reasonable person would take the view adopted by the trial court; or (3) the ruling rests on an error of law. *People v. Walker*, 2017 IL App (2d) 160589, ¶ 31.

¶ 26     Discovery in criminal cases is governed, in part, by Illinois Supreme Court Rule 412 (eff. Mar. 1, 2001). Rule 412(a) provides that, upon request of defense counsel, the State shall disclose to the defense information including (1) the names and addresses of individuals the State intends to call as witnesses, (2) the witnesses' relevant written or recorded statements, (3) written or recorded statements made by the defendant, (4) reports or statements of experts, and (5) any documents or tangible objects the State intends to use at trial. Ill. S. Ct. R. 412(a) (eff. Mar. 1, 2001). "The purpose of the discovery provision is to afford the accused protection against surprise, unfairness and inadequate preparation." *People v. Robinson*, 157 Ill. 2d 68, 79 (1993). Rule 412(h) provides, "Upon a showing of materiality to the preparation of the defense, and if the request is reasonable, the court, in its discretion, may require disclosure to defense counsel of relevant material and information not covered by this rule." Ill. S. Ct. R. 412(h) (eff. Mar. 1, 2001). This discretionary provision "was intended to have a small scope." *People v. Manley*, 19 Ill. App. 3d 365, 370 (1974).

¶ 27     Although compliance with the discovery requirements is mandatory, noncompliance requires a reversal only upon a showing of surprise or undue prejudice. *Robinson*, 157 Ill. 2d at 78. It is the defendant's burden to show surprise. *Robinson*, 157 Ill. 2d at 78. A

continuance for the purpose of pursuing an investigation addresses the issue of a late disclosure in a less drastic way than the total exclusion of the evidence, as a continuance may allow the defendant sufficient time to investigate the newly disclosed evidence. *Robinson*, 157 Ill. 2d at 78; *People v. Hood*, 213 Ill. 2d 244, 262-63 (2004). Accordingly, the exclusion of evidence is a last resort that is required only where a continuance would be ineffective. *People v. Sutton*, 327 Ill. App. 3d 273, 283 (2002). Even if the time granted in a continuance would not be sufficient for defendant's counsel to investigate the new evidence fully, requesting a continuance establishes that a substantial amount of time is both needed and seen as important by the defendant. See *Robinson*, 157 Ill. 2d at 79. Thus, the failure to request a continuance is a relevant factor in determining whether new evidence actually surprised or unduly prejudiced the defendant. *Robinson*, 157 Ill. 2d at 78. Indeed, when a defendant elects to forgo more moderate measures to deal with the purported discovery violation and proceeds with trial, the claimed error, if any, is waived. *Hood*, 213 Ill. 2d at 262-63; see also *People v. Dahl*, 110 Ill. App. 3d 295, 301 (1982) ("Failure by a defendant to request a continuance when evidence not contained in the State's answer to discovery is submitted is generally considered a waiver of the claim of surprise."). A defendant may not request only the most drastic measures to remediate a discovery violation, then argue on appeal that he is entitled to a new trial when those drastic requests were not granted. *Robinson*, 157 Ill. 2d at 78-79.

¶ 28    We find *Dahl* instructive. There, the defendant was charged for the theft of electricity exceeding $150 from the Illinois Power Company. *Dahl*, 110 Ill. App. 3d at 296. At trial, the State called a supervisor for the Illinois Power Company to testify as to the value of the electricity stolen. *Dahl*, 110 Ill. App. 3d at 301. The witness explained that a rate increase had gone into effect in July 1981, while the defendant was being investigated, and so, to give an

accurate answer of the value of the stolen electricity, he would need both the pre-July 1981 and post-July 1981 schedules. *Dahl*, 110 Ill. App. 3d at 301. During a recess, the witness obtained the schedules from his office and brought them to court. *Dahl*, 110 Ill. App. 3d at 301. The State offered the schedules into evidence to support the supervisor's calculations, and the schedules were admitted over the defendant's objection that they had not been disclosed during discovery. *Dahl*, 110 Ill. App. 3d at 301. The defendant did not request a continuance. *Dahl*, 110 Ill. App. 3d at 301. The appellate court affirmed the admission of the rate schedules, explaining that, although the defendant claimed that the schedules were not contained in the State's answer to discovery, the defendant made no motion for a continuance. Therefore, he waived the issue. *Dahl*, 110 Ill. App. 3d at 301.

¶ 29　　　　　Similarly, the record here shows that, on the morning of trial, the State informed defendant's counsel that Deutsch listened to 50 to 100 jail phone calls involving defendant and would identify defendant's voice on exhibit 14. Although defendant now claims that these revelations came as a surprise and affected his counsel's ability to prepare a defense, the record establishes that defendant's counsel did not request a continuance for the purpose of investigating the phone calls. Instead, counsel merely explained that she did not have access to the phone calls and sought their disclosure in a single comment, without follow-up, by stating that she was "gonna need those 50 phone calls." Counsel also argued that the November 7, 2019, phone call should not be admitted as evidence. Had counsel requested a continuance, she may have had the opportunity to consider Deutsch's expected testimony more fully and investigate the new evidence connecting defendant to exhibit 14. See *Hood*, 213 Ill. 2d at 262-63; *Robinson*, 157 Ill. 2d at 78-79. At the very least, requesting a continuance would have established that counsel viewed the phone calls as important and that she needed time to investigate more fully. Instead, counsel pursued measures

other than a continuance, and when the trial court denied those requests, proceeded with trial. Defendant cannot now complain that he should receive a new trial because the trial court denied those more drastic requests. *Robinson*, 157 Ill. 2d at 78-79. Accordingly, by failing to seek a continuance, defendant has forfeited this claim of error. *Robinson*, 157 Ill. 2d at 79.

¶ 30                              B. Failure to Strike Voice-Biometric Testimony

¶ 31          Defendant argues that the trial court also abused its discretion by failing to strike McCorkle's testimony about the effectiveness of the jail phone system because such evidence was expert testimony and McCorkle's expert qualifications were not disclosed to the defense prior to trial.

¶ 32          Rule 412(a)(iv) provides that, upon written motion of defense counsel, the State shall disclose to the defense, *inter alia*, any report or statement of experts made in connection with the case and a statement of qualifications of the expert. Ill. S. Ct. R. 412(a)(iv) (eff. Mar. 1, 2001).

¶ 33          Here, pursuant to Rule 412(a)(iv), the defense, prior to trial, requested any reports or statements of experts in connection with the case and their qualifications. In response, the State noted that, "[i]f and when the People intent [*sic*] to call an expert to testify, all relevant and discoverable materials related to that expert's opinion will be provided to the defense." Defendant argues that, although McCorkle was never disclosed as an expert, he nevertheless presented expert testimony at trial. Specifically, defendant complains that McCorkle testified about the jail phone system's voice-biometrics feature and how that feature was "pretty bulletproof" in preventing one inmate from using another inmate's PIN to make a call. Defendant contends that this testimony was prejudicial because the evidence of defendant's possession of the firearm was weak. According to defendant, McCorkle's testimony suggested that defendant was the only person who could have made the November 7, 2019, phone call. This argument is unavailing.

- 14 -

¶ 34    To preserve a claim of error, a defendant must object to the error at trial and raise the error in a posttrial motion; otherwise, the claim is forfeited. *People v. Kinnerson*, 2020 IL App (4th) 170650, ¶ 51. An objection to evidence is untimely if not asserted as soon as its ground becomes apparent. *Kinnerson*, 2020 IL App (4th) 170650, ¶ 52. However, where the ground for an objection does not appear until after the admission of the evidence, the opponent of the evidence should make a motion to strike. *Kinnerson*, 2020 IL App (4th) 170650, ¶ 52. Even so, once the basis of the motion to strike is available, the motion must be made as soon as practicable or the movant will be deemed to have waived any complaint regarding that evidence. *Kinnerson*, 2020 IL App (4th) 170650, ¶ 52.

¶ 35    In this case, the grounds for defendant's claim that McCorkle's voice-biometric testimony was undisclosed expert testimony became apparent when McCorkle began testifying about the jail phone system's voice-biometric feature on direct examination. Defendant, however, raised no objection at that time and, in fact, proceeded to cross-examine McCorkle. Indeed, during cross-examination, defense counsel elicited additional testimony that the voice-biometric feature was "bulletproof" and would tend to "block" an inmate from using another inmate's PIN to place a call. The State cannot be faulted for questions asked by defendant's counsel or responsible for its witnesses' answers to those questions. *People v. Burage*, 23 Ill. 2d 280, 282-83 (1961). "If a defendant procures, invites or acquiesces in the admission of evidence, even though it be improper, he cannot complain." *Burage*, 23 Ill. 2d at 283; *People v. Jefferson*, 2021 IL App (2d) 190179, ¶ 38. Defendant did not file a motion to strike until the following morning, well after the grounds for defendant's claim became apparent, and only after defendant had completed his cross-examination of McCorkle. Accordingly, we conclude that defendant failed to timely object and that defendant's motion to strike McCorkle's expert testimony was untimely. Therefore, we

hold that defendant forfeited this issue. See *People v. Bean*, 17 Ill. App. 3d 377, 382-83 (1974) (holding the State waived any error regarding the reception of alibi witnesses' testimony, where it raised no objection to the testimony when it was elicited, proceeded to cross-examine the witnesses, and failed to file a motion to strike the testimony until after the defense had concluded); *People v. Smith*, 145 Ill. App. 3d 262, 264-65 (1986) (holding defendant waived claim that officer's testimony was not disclosed during discovery and was improperly admitted at trial, where defendant did not object to the testimony, only raised the issue through a motion to strike during cross-examination, did not ask for time to investigate, and proceeded with trial).

¶ 36                    C. Cumulative Error Relating to the Foregoing Discovery Violations

¶ 37        Defendant argues that the cumulative impact of the foregoing discovery violations denied him a fair trial.

¶ 38        The cumulative effect of multiple errors may deny a defendant a fair trial. *People v. Mays*, 2023 IL App (4th) 210612, ¶ 114. Where errors, when individually considered, are not sufficiently egregious to grant a new trial, but the errors nevertheless create a pervasive pattern of unfair prejudice to the defendant, a new trial may be granted on the ground of cumulative error. *Mays*, 2023 IL App (4th) 210612, ¶ 114. Where none of the alleged errors amount to reversible error on any individual issue, there generally is no cumulative error. *Mays*, 2023 IL App (4th) 210612, ¶ 114.

¶ 39        As discussed, we have rejected defendant's claims of error based on forfeiture. Accordingly, defendant has not shown cumulative error. See *People v. Darr*, 2018 IL App (3d) 150562, ¶ 46 ("We are aware of no authority *** to support the contention that, by combining multiple unpreserved, forfeited errors, a defendant may transform his claim into one that is preserved or not forfeited.").

¶ 40                                    D. Sentencing Double Enhancement

¶ 41        Defendant argues that the trial court erred in sentencing him to 20 years for being an AHC because the court considered in aggravation his prior convictions of UUWF, which served as the predicate offenses for his AHC conviction.

¶ 42        One commits the offense of being an AHC if, *inter alia*, he or she possesses any firearm after having been convicted two or more times of UUWF. 720 ILCS 5/24-1.7(a)(2) (West 2018). Defendant's AHC conviction was based upon his 2015 and 2018 convictions for UUWF.

¶ 43        Whether the trial court relied on improper factors in fashioning a defendant's sentence is a question of law, which we review *de novo*. *People v. Williams*, 2018 IL App (4th) 150759, ¶ 18. There is a strong presumption that the trial court relied on proper legal reasoning in determining a sentence, and a court of review must consider the record as a whole, rather than focus on a few words or statements made by the trial court. *Williams*, 2018 IL App (4th) 150759, ¶ 18. It is the defendant's burden to establish affirmatively that his sentence was based on improper considerations. *Williams*, 2018 IL App (4th) 150759, ¶ 18.

¶ 44        A factor that is implicit in the offense for which the defendant has been convicted generally cannot be used as an aggravating factor in sentencing for that offense. *People v. Phelps*, 211 Ill. 2d 1, 11 (2004). In other words, a single factor cannot be used both as an element of an offense and as a basis for imposing a harsher sentence than might otherwise have been imposed. *Phelps*, 211 Ill. 2d at 11-12. The prohibition of such a "double enhancement" is a rule of statutory construction based on the assumption that, "in designating the appropriate range of punishment for a criminal offense, the legislature necessarily considered the factors inherent in the offense." *Phelps*, 211 Ill. 2d at 12.

¶ 45 In contending that the trial court subjected defendant to a double enhancement by considering his predicate felonies during sentencing, defendant argues that we should disregard two cases that rejected the argument he now raises—*People v. Brown*, 2018 IL App (1st) 160924, and *People v. Sherman*, 2020 IL App (1st) 172162—and instead rely on *People v. Taylor*, 2022 IL App (5th) 180192.

¶ 46 In *Brown*, the trial court stated at sentencing, following the defendant's AHC conviction, that it had considered all factors in aggravation and mitigation, including the defendant's criminal history—most of which, aside from his 2008 UUWF conviction, was nonviolent. *Brown*, 2018 IL App (1st) 160924, ¶¶ 1, 7. The defendant argued that the trial court improperly considered his prior UUWF conviction as an aggravating factor at sentencing, where that offense served as a predicate offense for his AHC conviction. *Brown*, 2018 IL App (1st) 160924, ¶ 19. In rejecting that argument, the First District noted that the process of fashioning an appropriate sentence that is tailored to the needs of society and the defendant, within the framework set by the legislature, is not an enhancement. *Brown*, 2018 IL App (1st) 160924, ¶ 20. Because that framework requires the trial court to consider aggravating and mitigating factors in imposing a sentence, including the defendant's criminal history, the appellate court concluded that the trial court could properly consider the predicate offense of UUWF "as part of [the defendant]'s criminal history." *Brown*, 2018 IL App (1st) 160924, ¶ 21. The appellate court explained that "while the *fact* of [defendant]'s prior UUWF conviction determined his eligibility for an AHC charge, it is the *nature and circumstances* of that conviction which, along with other factors in aggravation and mitigation, determined the exact length of his sentence." (Emphases in original.) *Brown*, 2018 IL App (1st) 160924, ¶ 21. Thus, for the trial court to consider the defendant's criminal history, it had to consider his prior UUWF conviction. *Brown*, 2018 IL App (1st) 160924, ¶ 21.

¶ 47    Defendant contends that the conclusion in *Brown* rested upon an improper reading of *People v. Thomas*, 171 Ill. 2d 207 (1996). In *Thomas*, the defendant's prior criminal history, which included two Class 2 felonies, subjected him to Class X sentencing on his second degree murder conviction, which is normally a Class 1 felony. *Thomas*, 171 Ill. 2d at 210. Our supreme court concluded that the trial court's consideration of those Class 2 felonies in aggravation during sentencing did not constitute a double enhancement because the *offense* of second degree murder was not enhanced from a Class 1 to a Class X felony. *Thomas*, 171 Ill. 2d at 224-25. Instead, defendant was merely subjected to a single punishment enhancement to the Class X range, due to his prior convictions, and the trial court was free to consider the nature and circumstances of those convictions to determine the exact length of the sentence. *Thomas*, 171 Ill. 2d at 224, 227-28.

¶ 48    Defendant asserts that because *Thomas* did not involve a double enhancement stemming from the trial court's consideration, in aggravation, of a defendant's prior felonies that also served as elements of the underlying offense, *Thomas* is distinguishable, and *Brown* was incorrect to rely on it. We reject this argument. The court in *Brown* acknowledged that *Thomas* "concerned the mandatory Class X sentencing statute rather than the Class X AHC offense" and, nevertheless, found *Thomas*'s reasoning applicable. *Brown*, 2018 IL App (1st) 160924, ¶ 21. We reach the same conclusion. In fact, this court has previously adopted the same position, albeit in an unpublished order. See *People v. Mumphrey*, 2020 IL App (4th) 180015-U, ¶ 52 ("[W]e see no reason that because in *Thomas* the prior offenses were used to make the defendant eligible for Class X sentencing, and here the prior offense constituted an element of a Class X felony, makes any difference.").

¶ 49    In *Sherman*, the trial court told the defendant during sentencing following his conviction for AHC that his " 'background is not conducive to a six-year sentence. You've had a

gun in your background. You have got two burglaries that you were sentenced to 10 years and 9 months.' " *Sherman*, 2020 IL App (1st) 172162, ¶ 22. The trial court further noted, in aggravation, the fact (underlying his AHC conviction) that the defendant possessed a pistol loaded with 25 rounds. *Sherman*, 2020 IL App (1st) 172162, ¶ 22. The defendant argued that the court's consideration of the burglaries underlying his AHC offense constituted a double enhancement. *Sherman*, 2020 IL App (1st) 172162, ¶ 48. The First District rejected that argument, concluding that the trial court did not err in referring to the underlying burglaries because in doing so, the trial court was properly weighing the defendant's criminal history as it related to his rehabilitative potential. *Sherman*, 2020 IL App (1st) 172162, ¶ 54. Additionally, even if the reference to the burglaries had been improper, the court also referenced the loaded pistol as an independent aggravating factor at sentencing. *Sherman*, 2020 IL App (1st) 172162, ¶ 54.

¶ 50　　　　By contrast, in *Taylor*, the defendant, following his conviction for being an AHC, argued on appeal that his trial counsel was ineffective for failing to stipulate to the defendant's felon status, causing the jury to hear the nature of his prior conviction. *Taylor*, 2022 IL App (5th) 180192, ¶¶ 16, 24. The defendant also argued that, at sentencing, the trial court imposed a double enhancement because it improperly considered his prior felonies for aggravated battery and unlawful delivery of a controlled substance, which were the predicate felonies for his AHC conviction. *Taylor*, 2022 IL App (5th) 180192, ¶¶ 1, 24. During sentencing, the trial court, considering the defendant's criminal history, noted that the defendant had mostly minor offenses, except for his convictions for obstructing justice, criminal damage to property, delivery of a controlled substance, and aggravated battery, which the trial court found " 'concern[ing].' " *Taylor*, 2022 IL App (5th) 180192, ¶ 21. The Fifth District reversed and remanded for a new trial based upon the defendant's ineffective-assistance claim but went on to "briefly acknowledge" the

defendant's sentencing argument. *Taylor*, 2022 IL App (5th) 180192, ¶ 54. After citing two cases for boilerplate, the appellate court noted, without any citation to (or analysis of) additional authority, that, if the defendant was subject to sentencing following retrial, "the predicate felonies used to form the basis of his criminal charges should not be considered as aggravating factors at sentencing." *Taylor*, 2022 IL App (5th) 180192, ¶¶ 54-55.

¶ 51        We reject defendant's invitation to apply *Taylor* instead of cases like *Brown* and *Sherman* here. Because *Taylor* ultimately rested on the appellate court's finding of ineffective assistance of counsel, and only "briefly acknowledge[d]" the defendant's sentencing argument, the appellate court, understandably, did not provide significant analysis of the defendant's double-enhancement claim. *Taylor*, 2022 IL App (5th) 180192, ¶¶ 54-55. As a result, the appellate court did not address *Brown* and *Sherman*, which deemed as appropriate the consideration of a defendant's criminal history (including predicate offenses) in fashioning a sentence. *Taylor*, 2022 IL App (5th) 180192. Indeed, the Fifth District later, albeit in an unpublished order, cited *Sherman* with approval in concluding that no double enhancement occurred when the trial court considered the defendant's criminal history, which included the offenses that rendered him eligible for Class X sentencing, in sentencing the defendant for his conviction of aggravated battery. *People v. Wade*, 2022 IL App (5th) 190458-U, ¶¶ 5, 25.

¶ 52        We conclude that, though defendant's prior UUWF convictions were predicate offenses for the AHC conviction, the trial court could consider them in the context of defendant's criminal history. "[F]actors inherent in the offense can sometimes be considered, along with other factors in aggravation and mitigation, as part of the nature and circumstances of the case." *People v. McGath*, 2017 IL App (4th) 150608, ¶ 73.

- 21 -

¶ 53    Defendant nevertheless cites some of the trial court's comments as indicative of its reliance on an improper sentencing factor. At sentencing, after defendant's counsel objected to the court's consideration "in aggravation anything that is alleged in the indictment," the court responded, "It is his prior record. That had to be proved up at the trial and I have to consider it because it is part of the record." Thereafter, when imposing its sentence, the court stated:

> "[D]efendant has a history of prior delinquency and criminal activity. The defendant had no juvenile record. All of a sudden he picks up some serious cases as an adult. The defendant has a prior conviction from June 29, 2012, four years and six months Illinois Department of Corrections for possession of a stolen firearm. I understand [defense counsel]'s objection, but I do believe it's proper for the Court to consider his prior record on the sentencing in this [AHC] because those offenses were proved up as part of the elements before the jury, but I can consider those in sentencing. The defendant has a second [UUWF], a Class 2, three years Department of Corrections on December 12, 2015. And then, finally, we have [a UUWF], a Class 2. The date of the offense, of the judgment of conviction was June 29, 2018, four years Department of Corrections, and then the defendant is on parole or mandatory supervised release at this time. You have a serious, serious criminal record regarding possession of weapons. And I do believe this sentence is necessary to deter others from committing the same offense."

Defendant focuses on these statements to claim that the court improperly considered his predicate felonies in aggravation. However, as previously noted, we presume that the court based its sentencing determination on proper legal reasoning, and we will consider the record as a whole, rather than focus on a few words or statements by the court. *Williams*, 2018 IL App (4th) 150759,

¶ 18. When read in context, these comments were made in reference to defendant's criminal history, which the court properly considered in fashioning an appropriate sentence within the statutory range. The court explicitly noted defendant's prior record and listed his convictions as part of defendant's "history of prior delinquency and criminal activity." The court then stated that it believed defendant's conduct was likely to reoccur. Thus, the court's comments pertaining to defendant's prior convictions were its reflection on defendant's rehabilitative potential. This was a proper sentencing consideration.

¶ 54 Further, even assuming the trial court improperly considered defendant's prior convictions in aggravation, it referenced other independent aggravating factors to support defendant's sentence. See *People v. Scott*, 2015 IL App (4th) 130222, ¶¶ 55-56 (holding that though the trial court considered, in aggravation, an improper factor of compensation at sentencing, remand was unnecessary, since the trial court also discussed the extreme nature of the defendant's criminal history, which was an appropriate aggravating factor); *Sherman*, 2020 IL App (1st) 172162, ¶ 54 (stating that even if consideration of predicate felonies was improper, the trial court noted evidence that the firearm held 25 bullets as independent reason in aggravation). In imposing its sentence, the court noted that it had also considered defendant's character and attitude, which made it likely that he would commit another criminal offense; that its sentence was necessary to deter others from committing the same offense; and that the sentence was necessary for the protection of the public. These independent factors were proper for the court to consider in fashioning its sentence. We hold that defendant's sentence was not the result of a double enhancement.

¶ 55 III. CONCLUSION

- 23 -

¶ 56    For the reasons stated, we affirm the judgment of the trial court.

¶ 57    Affirmed.

***People v. Brown*, 2023 IL App (4th) 220476**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Winnebago County, No. 19-CF-3386; the Hon. Ronald J. White, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Austin Wright, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | J. Hanley, State's Attorney, of Rockford (Patrick Delfino, David J. Robinson, and Matthew S. Goldman, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |