NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250858-U

NO. 4-25-0858

IN THE APPELLATE COURT

FILED
June 10, 2026
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Tazewell County |
| RONNIE LEWIS RICHMOND, | ) | No. 23CF835 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Christopher R. Doscotch, |
| | ) | Judge Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court.
Justices Doherty and Vancil concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed defendant's convictions and sentences where the trial court did not err in allowing evidence of a prior drug transaction and there were no sentencing errors. However, the appellate court remanded the case to the trial court where trial counsel was ineffective in failing to file a certificate for a waiver of assessments.

¶ 2    Defendant, Ronnie Lewis Richmond, appeals his convictions for being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2022)) and armed violence (720 ILCS 5/33A-2(a) (West 2022)). For the following reasons, we affirm but remand to the trial court for defense counsel to comply with Illinois Supreme Court Rule 404(e) (eff. Sept. 1, 2023) and file a certificate for a waiver of assessments on defendant's behalf.

¶ 3                              I. BACKGROUND

¶ 4    Defendant was initially charged on December 11, 2023. On March 28, 2024, he was charged by second superseding indictment with being an armed habitual criminal (720 ILCS

5/24-1.7(a) (West 2022)) (recently renamed as of January 1, 2025, as "[u]nlawful possession of a firearm by a repeat felony offender"), armed violence (720 ILCS 5/33A-2(a) (West 2022)), unlawful possession with intent to distribute a look-alike substance (720 ILCS 570/404(b) (West 2022)), and unlawful use of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2022)). The charges were based on his possession of a look-alike substance and a handgun on December 8, 2023. The armed habitual criminal charge was also based on his prior convictions for unlawful delivery of a controlled substance in Peoria County in 2008 and felon in possession of a firearm in federal court in 2009. Defendant pleaded not guilty to all charges.

¶ 5                          A. Pretrial Proceedings

¶ 6          On May 1, 2024, the State filed a motion *in limine*, requesting to introduce evidence that defendant sold narcotics to an undercover officer prior to December 8, 2023. The State argued that this evidence would show that (1) the undercover officer messaged defendant to purchase "defense" (heroin) and "hard" (crack cocaine) on November 16, 2023, (2) defendant and the undercover officer completed a transaction on November 17, 2023, in a Walmart parking lot in East Peoria, Illinois, (3) defendant offered to sell the undercover officer additional narcotics, and (4) they scheduled to meet again on December 8, 2023, at the same Walmart in East Peoria.

¶ 7          On May 13, 2024, the trial court held a hearing on the State's motion *in limine*. The State explained that the evidence of the prior purchase showed defendant's intent to deliver the drugs that were found, as he was arrested before he actually delivered them on December 8, 2023, as well as knowledge, *modus operandi*, and an ongoing series of events. The State acknowledged there was no issue of identity. The State moved to strike any reference in the text messages to interactions between defendant and the undercover officer prior to November 17, 2023. Defense counsel objected, arguing that the evidence was cumulative and more prejudicial than probative,

- 2 -

and likewise acknowledged that identity was not at issue. The court ultimately granted the State's motion *in limine* and allowed the redactions suggested by the State to remove references to any interactions prior to November 17, 2023. The court found that the evidence showed defendant's intent and knowledge, as well as a continuing narrative due to the proximity of the two drug deals. The court stated that it would give a limiting instruction to the jury regarding the evidence of the November 17, 2023, transaction.

¶ 8                                B. Jury Trial

¶ 9        The jury was selected on May 20, 2024, and the trial was held on May 21, 2024. The following evidence was presented.

¶ 10        Dustina Stevens testified that she was a police officer with the Chillicothe Police Department and involved with the Peoria Multi-County Enforcement Group (PMEG), which works on drug cases around central Illinois. As part of her duties for PMEG, she was an undercover drug buyer in an investigation of defendant. She testified that she was involved in an operation on December 8, 2023. When the State indicated it would go into some background into the investigation, the trial court instructed the jury:

> "Evidence is going to be received that the Defendant has been involved in an offense other than those charged in the indictment.
>
> This evidence is being received on the issues of the Defendant's intent and knowledge and may be considered for [*sic*] you only for that purpose.
>
> It is for you to determine whether the Defendant was involved in that offense and if so, what weight should be given to this evidence solely on the issues of intent and knowledge."

¶ 11        Stevens continued to testify that the investigation of defendant began through a

confidential source, who introduced her to defendant. Stevens then contacted defendant via text messages, which were admitted into evidence. Stevens messaged defendant on November 16, 2023, that she was looking to "get ball of defense and hard." She testified that "[d]efense is heroin, and hard is crack cocaine." She stated that she then met defendant in the parking lot of a Walmart in East Peoria on November 17, 2023, to purchase the drugs. On the State's request and without objection, the trial court admitted a body camera video of the transaction between Stevens and defendant on November 17, 2023. After Stevens and defendant met, defendant texted Stevens to offer to sell her additional drugs.

¶ 12        Stevens again arranged to purchase "a zip," which was a quantity of heroin, from defendant on December 8, 2023, for $1,400. They planned to meet in the same location. Stevens drove the same vehicle, but instead of meeting defendant, she entered Walmart. Law enforcement's plan was for defendant to arrive at the meeting spot with the drugs, and a Special Weapons and Tactics (SWAT) team would then arrive and arrest him without involving Stevens. After defendant arrived, Stevens exited Walmart and saw the SWAT vans arrive and throw a "flash bang." She testified that defendant "had thrown his truck in reverse and peeled off or tried to peel off really quick, and then [she] just heard a loud bang so [she] had assumed he had crashed."

¶ 13        The State presented several other law enforcement officers' testimony or stipulated testimony.

¶ 14        The parties stipulated that Illinois State Police Trooper James Meyer would testify that he flew an airplane providing surveillance on December 8, 2023, and observed a blue pickup truck leave the residence at 2825 West Farrelly Avenue in Peoria, Illinois, and crash in the parking lot of the Walmart in East Peoria. Meyer's airplane was equipped with video cameras, which recorded these events. Those recordings were admitted into evidence.

¶ 15    Brian Grice testified that he was a police officer for the Peoria Police Department and was involved in the surveillance of an operation related to defendant on December 8, 2023. He was positioned at 2825 West Farrelly Avenue prior to the operation, which was defendant's residence. He testified that he observed defendant exit the front door of the residence, enter a blue Dodge truck, and leave eastbound on Farrelly Avenue.

¶ 16    The parties then stipulated that Peoria police officer Brian Moore would testify that he assisted in providing surveillance for the incident on December 8, 2023, and observed the meeting location from across the street. He recorded a video of defendant's vehicle entering the parking lot and later crashing into a semitruck. That video was admitted into evidence.

¶ 17    Travis Heck testified that he was a master sergeant with the Illinois State Police and served as the team leader for their SWAT team. He was involved in an operation involving defendant on December 8, 2023, because his SWAT team was requested by another agency to assist with apprehending someone being set up by an undercover agent. Heck testified their "plan as SWAT was to set up and do what we would call a vehicle takedown utilizing numerous vehicles to park in front, behind, and beside the vehicle so that it wouldn't be able to evade." Heck stated that circumstances caused a delay in this setup, and when SWAT agents were deployed on foot when defendant's vehicle approached,

> "the target fled backwards as [SWAT agents] identified themselves in an extremely fast, reckless manner and turned sideways basically on a reverse J arch sliding sideways through the Walmart parking lot and [defendant's] pickup truck impaled itself among a parked semi that sat vacant parked in the back of the parking lot."

Other teams were blocked from approaching by a semitruck and two pedestrians, which "made the timing off in terms of all three vehicles arriving at the same time so the vehicle that arrived first,

it didn't put us in position to be able to block him from fleeing." After defendant's truck collided with the semitruck, Heck "drove straight up to his location." Defendant was unable to drive the vehicle, "so he attempted to get out of the vehicle and what appeared to me as if he was going to run." However, agents "were able to block him" and give "verbal commands," which defendant complied with.

¶ 18    Heck testified that as he approached defendant, he was "sitting on the door pillar of the driver's side door," and he "complied and put his hands in the air." Heck attempted to take him into custody and realized that defendant's foot was stuck in the steering wheel, which Heck believed was the reason he was unable to flee. Another agent then assisted Heck in getting defendant's foot out from the steering wheel and apprehending him. Heck explained that once a suspect was in custody, the SWAT team's role was complete, and they would then allow the other agency to search the structure—in this case, defendant's vehicle.

¶ 19    Dave Logan testified that he was a Peoria police officer assigned collateral duty with the Drug Enforcement Administration (DEA). He surveilled the events of December 8, 2023. He testified consistently with the previous officers with respect to the events in the parking lot and added that there were at least seven or eight SWAT team members involved. He observed that the doors on the passenger side of the vehicle were opened at some point soon after defendant was taken into custody and remained open.

¶ 20    Logan assisted with the search of the vehicle. He took photos of the vehicle during the search, which were admitted into evidence. In the center console, he saw and photographed "a clear, plastic baggy that's knotted off" and contained "a whiter, grayish substance in it" that appeared to be heroin. The photograph also depicts "the rear of a handgun slide," which was "in between the driver's seat and the center [console]," where Logan initially observed it. The handgun

had an extended magazine. There were two cell phones on the floor of the driver's side. Logan removed the handgun from between the seat and center console to take a picture of it.

¶ 21        Logan confirmed that there were other officers present in the parking lot who had access to the truck through the opened passenger doors before he conducted the search of the truck. He denied being aware that Detective Jeffrey Stolz wrote in an affidavit for a search warrant of defendant's phone that the gun was found in the center console. Logan also denied being aware of any times that police planted evidence or ever being part of that occurring. He denied planting the gun or the drugs in defendant's car. When asked by defense counsel, "[I]n terms of reading stories, looking at movies, you're aware that evidence has been planted by officers in the history of mankind?" he responded, "[T]hat's probably happened at some point in time," but that he "wasn't present for any of those things so whether I read a story or saw a movie," "those are often farcical anyways."

¶ 22        Logan also testified about the operation involving defendant on November 17, 2023. The trial court again reminded the jury that this was evidence "that the Defendant has been involved in an offense other than those being charged in the indictment," which was "being received on the issues of the Defendant's intent and knowledge." The court instructed the jury that this evidence "may be considered by you only for that limited purpose" and that it was for the jury to "determine whether the Defendant was involved in that offense and if so, what weight should be given to this evidence on the sole issues of intent and knowledge." Logan continued to testify that he was surveilling the operation on November 17, 2023, from the Walmart parking lot. He videotaped the operation, and the video was admitted into evidence. Logan testified that the license plate on the vehicle at the November 17 transaction was the same as the December 8 transaction. Logan acknowledged that the vehicle was not registered to defendant.

¶ 23　　　　Chris Beecher testified he was a detective for the Pekin Police Department and surveilled the events of December 8, 2023. He agreed there were approximately 20 officers and 5 to 10 SWAT agents on the scene at that time and the passenger doors of defendant's truck were open throughout the processing of the scene. Beecher "assisted in processing and collecting evidence from the vehicle," including "suspected drugs, two cell phones, and a handgun." He personally collected the cell phones from the driver's side floor. He testified that "the gun was tucked between the driver's seat and the center console and the drugs were sitting in a cupholder in the center console." Beecher testified he was aware that from time to time, defendants make a claim that evidence is planted. He said he had read one article where that was found to have happened. He denied planting the drugs or the gun in the truck.

¶ 24　　　　Stolz testified that he was a detective with the Pekin Police Department, as well as a task force officer with the DEA, and was involved in a drug investigation regarding defendant. He was the case agent, meaning that he "developed [defendant] as a target and had the undercover officer introduced." He explained that he was responsible for coordinating with other agencies, such as the DEA, Illinois State Police, and PMEG. He confirmed there were operations that occurred on November 17 and December 8, 2023, and testified to his observations of the events of December 8, 2023.

¶ 25　　　　Stolz testified that there were 25 rounds of ammunition in the gun found in the truck. He confirmed he saw the gun before it had been moved by anyone, and it was located between the seat and center console. When defense counsel confronted Stolz with the fact that he indicated in the affidavit for the search warrant on the cell phones that the gun was found in the center console, Stolz explained, "It was at the center console. I could of [*sic*] had an error in typing, but it was touching the center console between the seat." He denied it was a misrepresentation.

The State agreed to stipulate that the affidavit stated the gun was in the center console. He denied planting the gun or drugs in defendant's car.

¶ 26 The parties stipulated to the fact that Angela Nealand would testify that she was "employed by the Illinois State Police in the Division of Forensic Services and works at the Morton Forensic Science Laboratory." She tested the suspected drugs, weighing 27.6 grams, and found that the substance contained flunitazene and flualprazolam, neither of which were controlled substances. She would testify that "flunitazene is a novel opioid and is reported to cause psychoactive effects similar to heroin, fentanyl, and other opioids," while "flualprazolam is a novel benzodiazapine and is similar to alprazolam which is commonly sold as the brand name xanax."

¶ 27 The parties then stipulated to the fact defendant "has previously been convicted of two qualifying predicate offenses for the purposes of the armed habitual criminal charge." The State then rested. Defendant indicated he did not intend to testify. Defendant did not present any evidence.

¶ 28 The parties then proceeded to closing arguments. The State summarized the evidence elicited at trial and reviewed the charges against defendant and the applicable law. In turn, defense counsel emphasized that there was no fingerprint evidence, DNA evidence, or evidence as to ownership of the gun. He contended that "[o]ne possible explanation is that they planted [the gun]." He reiterated that there were at least "20 officers roaming around" while "[t]he truck doors are open" and "[v]arious cops are in and out of the truck." He questioned the police officers' credibility when they denied that they planted the evidence. He argued that Stolz "wanted to take this guy down," "targeted him," and was "emotionally involved, invested in the outcome of this case, and that taints his testimony." Defense counsel admitted his client was guilty of selling a look-alike substance. However, he emphasized that "[t]his evidence does not prove any of the

three counts related to firearms." In rebuttal, the State pointed out that defense counsel did not ask any of the witnesses why there was no DNA evidence taken in this case. The State contended that there was no evidence that anyone planted the gun on defendant or had any motivation to do so, and defendant was only "targeted because he's a drug dealer," and the officers were "doing their job."

¶ 29　　　　The trial court provided the jury with instructions. Among them was an instruction that stated:

> "Evidence has been received that the Defendant has been involved in an offense other than those charged in the indictment. This evidence has been received on the issues of the Defendant's intent and knowledge and may be considered by you only for that limited purpose.
>
> It is for you to determine whether the Defendant was involved in that offense and if so, what weight should be given to this evidence on the issues of intent and knowledge."

¶ 30　　　　The jury found defendant guilty of all four charges.

¶ 31　　　　　　　　　　　　　C. Posttrial Motions

¶ 32　　　　On August 26, 2024, defendant filed a motion for a new trial. He raised several arguments, including ineffective assistance of counsel. The trial court held a preliminary inquiry on defendant's motion on August 28, 2024, in accordance with *People v. Krankel*, 102 Ill. 2d 181 (1984). The court found there was "some factual basis for bullett [*sic*] points 1 +2 of the affidavit," but not defendant's three other claims. The court thus appointed *Krankel* counsel to represent defendant on two of his claims of ineffective assistance of counsel.

¶ 33　　　　On December 19, 2024, defendant's newly appointed posttrial counsel filed a

motion raising several issues, including that the trial court erred when it granted the State's motion to allow evidence related to the November 2023 drug sale and the State failed to prove defendant guilty of any offense beyond a reasonable doubt.

¶ 34     The trial court held a hearing on defendant's posttrial motion on January 23, 2025. Ultimately, the court denied defendant's posttrial motion in its entirety, finding that the court did not err in granting the State's motion to allow evidence relating to the November 2023 transaction, the evidence of defendant's guilt was overwhelming, and defendant's trial counsel was not ineffective.

¶ 35                                    D. Sentencing

¶ 36     The trial court held a sentencing hearing on March 20, 2025. The parties and court agreed that the unlawful use of a weapon charge would merge with the armed habitual criminal charge, while the unlawful possession of look-alike substance with intent to deliver charge would merge with the armed violence charge. The sentencing range for being an armed habitual criminal was 6 to 30 years, served at 85%, and the range for armed violence was 15 to 30 years, served at 50%. Both offenses were nonprobationable. The court discussed the armed habitual criminal charge, stating:

> "[F]or armed habitual what I'm going to say is the—the two offenses that are predicate offenses, I can consider those in aggravation or mitigation. It's not a double enhancement in this. I've looked at the case law on that because they're predicate offenses. But I do get to consider that in criminal history, okay? So you don't get to take those out of the criminal history part of the whole totality of it, but being mindful of the fact that it's armed habitual. But I'll just note that, that I get to consider the entire criminal history, all right?"

¶ 37 The State then presented formal evidence in aggravation. Richard Linthicum testified that he was a Peoria police officer and had contact with defendant in October 2009. At that time, Linthicum observed defendant standing directly in front of the federal courthouse with "a large bulge in the front of his pants." When Linthicum approached, defendant ducked behind a newspaper box briefly before coming out to speak to him. Defendant denied having "anything on him," but a pat down revealed "a loaded firearm in his rear pocket" and a ski mask. According to Linthicum, he assumed defendant had moved the gun from the front of his pants to his rear pocket when he briefly ducked behind the newspaper box. Defendant was on parole at the time.

¶ 38 Logan Grayson and Brian Moore testified that they were Peoria police officers and had contact with defendant on March 10, 2018. They received a ShotSpotter alert about the presence of gunfire and initiated a traffic stop on two cars from which the shots had apparently been fired. One car stopped and another kept going. Defendant turned out to be the driver of the vehicle that did not initially stop. The occupants of that car initially refused police orders to exit the vehicle. Police found a gun with a loaded extended magazine under defendant's seat, which defendant acknowledged possessing and intending to sell.

¶ 39 Andrew Connor testified that he was a Peoria police officer and had contact with defendant on September 6, 2020, when he observed defendant driving a tan SUV without a seatbelt. Connor attempted to stop him, but defendant fled and eventually abandoned the car. The car door was open, and Connor found a broken fence at the rear of a nearby residence that defendant had apparently fled through. A search of the vehicle revealed 11.95 grams of clonazepam (a controlled substance), a .40-caliber bullet, and three digital scales with a white powdery substance on them that tested positive for cocaine. Connor later learned that defendant had reported the vehicle stolen a few days after fleeing from Connor. Defendant denied being the

driver and having knowledge of the contraband inside the vehicle.

¶ 40 Krista Marx testified that she was a Peoria police officer and had contact with defendant on September 10, 2020. Defendant reported to her that his car had been stolen between September 4 and 7, 2020, but admitted he did not immediately report the vehicle as stolen because he had active warrants out for his arrest.

¶ 41 Matheson Wood testified that he was a Peoria police officer and had contact with defendant on October 18, 2019. Wood attempted to conduct a traffic stop on a vehicle that disregarded a stop sign. The driver did not stop for several blocks, despite Wood using his sirens and lights. Defendant was driving the vehicle. Wood observed a bag of what appeared to be controlled substances in the center console and asked defendant to step out of the car. Wood conducted a field test of the substance in the bag, which tested positive for heroin. He also observed six individually packaged bags of cannabis and a scale in the vehicle. Lab testing confirmed the substance to be heroin and fentanyl. Wood also had contact with defendant on October 16, 2020, when he observed him standing outside of a residence. Wood approached him because defendant had two outstanding warrants for his arrest at that time. Defendant discarded a bag when Wood approached, and a search of defendant when taken into custody revealed 16 more bags. The bags tested positive for methamphetamine and heroin.

¶ 42 Ryan Tarby testified that he was a Tazewell police officer and was involved in an investigation into an overdose that occurred at the Tazewell County jail around December 13, 2023. He found drugs in the bag of the man who overdosed, which tested positive for heroin and fentanyl. During the investigation, another man in the jail reported that he had also taken drugs, which he got from someone who was recently brought in. Defendant was the only person who was brought in that day. Surveillance video from the jail showed what appeared to be multiple

transactions between defendant and other men in the jail. At the State's request, the trial court took judicial notice of several Tazewell County cases where the three men involved in the drug transactions in the Tazewell County jail with defendant pleaded guilty and were convicted of unlawful possession of contraband in a penal institution.

¶ 43        Defendant did not present any formal evidence in mitigation at the hearing, but the presentence investigation report (PSI) included a written statement from his friend, Diana Avila Johns. Johns wrote that she had known defendant for nine years. She stated that while her daughter was out of town for work, defendant would help take care of her granddaughter, transporting her to school and activities and providing her with meals. Johns added that defendant often helped her and her husband at their house with moving and maintenance. She stated that she found him to be a trustworthy friend and was shocked to find out about the charges against him. She described defendant as a man who has not had many opportunities in life, but who was motivated to do better.

¶ 44        The PSI indicated that defendant had a lengthy criminal history and had been convicted of 8 misdemeanors, 3 felonies, 2 local offenses, and 14 petty (primarily traffic) offenses between 1998 and 2018. He was additionally convicted in 2010 in federal court of being a felon in possession of a firearm and sentenced to five years in prison. He had at least four more pending cases in Peoria County. The PSI noted that defendant had two children, ages 20 and 9, both of whom "before his arrest he would see *** daily," but he "does not pay child support." He reported part-time self-employment in 2023 doing painting and plugging tires and indicated that he worked for a restaurant for three or four months in 2022, but his employment was never verified. Defendant dropped out of high school before completing ninth grade. He reported first consuming marijuana when he was eight years old and alcohol when he was nine years old, and he further reported that he would consume an ounce of marijuana, a fifth of whiskey, and ecstasy daily until December 7,

- 14 -

2023. He admitted he "has been an addict for twenty years and it has negatively affected all aspects of his life." He attended substance abuse education classes while in custody.

¶ 45    The State argued that multiple factors in aggravation applied, including that (1) defendant's conduct caused or threatened serious harm, not only in delivering drugs, but by attempting to flee from police and crashing into a semitruck; (2) defendant received compensation for committing the offense because he was there to sell drugs; (3) defendant had a "very long and rather egregious" criminal history, he had multiple convictions for possession of drugs and eluding police, and the circumstances of his prior convictions were "particularly egregious," especially his conviction for being "outside of the federal courthouse in Peoria with a gun in his waistband and a ski mask in his pocket"; (4) a sentence was necessary to deter other from committing the same crime; and (5) defendant was on warrant status for missing a trial in Peoria on other charges at the time he committed the offenses at issue in this case. The State added that defendant had barely been employed in his life and had been using drugs and alcohol his entire life.

¶ 46    Defendant declined to make a statement in allocution. His counsel argued that Johns's letter provided a different view of defendant and asked the trial court not to give defendant a sentence of more than 20 years on each charge, to run concurrently.

¶ 47    The trial court explained that it considered "the [PSI], evidence presented, arguments of counsel, statutory and non-statutory factors in aggravation and mitigation, whether specifically mentioned or not, history, character of the defendant, having due regard for the seriousness of the offense with the objective of restoring the defendant to useful citizenship." The court found there were "no factors relevant in this case in mitigation." The court noted that defendant's behavior threatened to cause serious harm because he tried to flee the scene, "consistent with his other behavior that we've heard about here today in terms of fleeing," and had

an extended magazine in the pistol that was found in the vehicle. The court further found that deterrence was an important factor in aggravation, as defendant had been arrested, imprisoned, and placed on pretrial release several times, and "[e]ven on pretrial release and missing for a warrant, he's still out and about, selling drugs." The court stated that his criminal history was "not the worst, but it's not unserious either." The court noted the "2006 unlawful possession controlled substance," "[t]he case with the gun at the federal courthouse and ski mask," the "2003 Peoria controlled substance," and "the other narcotics cases," as well as "these other cases that the officers testified about today involving pills, heroin, or methamphetamine, scales, multiple baggies," which occurred while defendant was "on pretrial release."

¶ 48 The trial court acknowledged that Johns's letter "does show a totally different side than what I've seen here today in court, what I've seen here at trial, and what's in this PSI." However, the court stated that "unfortunately for society's part, *** the description of [defendant] in the letter is not the one that society is seeing on a regular basis or really on any significant basis." The court noted that defendant was 41 years old and did not "have much of a work history other than the drug dealing." The court added that the "situation in the jail" went to defendant's "history and character." The court also noted that defendant maintained that he was not guilty in this case and was not convicted beyond a reasonable doubt, which showed that defendant did not accept "any responsibility for [his] actions and in fact [he] flee[s] or run[s] from the police." The court noted that defendant denied culpability for his previous convictions as well and even filed a false stolen vehicle report. The court found that there was no change in defendant's actions between 2009 and the present, and that at the age of 41, defendant's potential for rehabilitation was "much outweighed by the seriousness of the offenses, the need for deterrence, punishment, and the protection of society."

¶ 49 The trial court ultimately sentenced defendant to concurrent sentences of 24 years in prison for being an armed habitual criminal, to be served at 85%, and 26 years for armed violence, to be served at 50%, followed by 1½ years of mandatory supervised release. As part of the sentencing order, the court imposed fines and assessments totaling $846.

¶ 50 Defense counsel filed a motion to reconsider defendant's sentence on April 22, 2025. Defendant filed a *pro se* motion to reconsider his sentence on July 14, 2025. The trial court denied the motions on August 15, 2025.

¶ 51 This appeal followed.

¶ 52                                    II. ANALYSIS

¶ 53 On appeal, defendant argues that (1) the trial court erred in admitting evidence related to the prior drug transaction on November 17, 2023, (2) the court imposed an improper double enhancement when it sentenced defendant for the offense of being an armed habitual criminal and considered one of the predicate felony offenses as a factor in aggravation, (3) the court abused its discretion in finding no factors in mitigation applied at sentencing, and (4) defense counsel was ineffective for failing to file a certification for a waiver of court assessments under Illinois Supreme Court Rule 404 (eff. Sept. 1, 2023).

¶ 54                          A. Evidence of Prior Drug Transaction

¶ 55 Defendant first argues that the trial court abused its discretion in granting the State's motion *in limine*, which allowed the State to introduce evidence of the prior drug transaction between defendant and the undercover officer on November 17, 2023, because it was more prejudicial than probative.

¶ 56 "[A] trial court's ruling on the admissibility of evidence will not be reversed on appeal absent an abuse of discretion." *People v. Watkins*, 2015 IL App (3d) 120882, ¶ 44. "Such

an abuse of discretion will be found only where the trial court's decision is arbitrary, fanciful or unreasonable or where no reasonable man would take the view adopted by the trial court." (Internal quotation marks omitted). *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 57	Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." This evidence, referred to as other-crimes evidence, is " 'objectionable not because it has little probative value, but rather because it has too much. [Citation.] Such evidence overpersuades a jury, which might convict the defendant only because it feels that [the] defendant is a bad person who deserves punishment.' " *Watkins*, 2015 IL App (3d) 120882, ¶ 44 (quoting *People v. Manning*, 182 Ill. 2d 193, 213-14 (1998)). Although evidence of other crimes is not admissible to prove the defendant's propensity to commit the charged crime, it may be admissible for any nonpropensity purpose, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *Illgen*, 145 Ill. 2d at 364-65. Nevertheless, such evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011). If evidence is admitted for a valid nonpropensity purpose, the court "shall restrict the evidence to its proper purpose or scope and instruct the jury accordingly." Ill. R. Evid. 105 (eff Jan. 1, 2011). A proper limiting instruction "substantially reduce[s] any prejudicial effect created by the admission of the prior-offense evidence." *Illgen*, 145 Ill. 2d at 376.

¶ 58	"Illinois courts have routinely allowed evidence of a defendant's prior or subsequent drug transactions to be admitted into evidence at trial to establish a defendant's intent

to deliver the drug for which the defendant is currently charged or for any other relevant and permissible purpose." *Watkins*, 2015 IL App (3d) 120882, ¶ 46 (collecting cases). Such evidence has also been admitted to prove identity, knowledge, *modus operandi*, absence of mistake, and a continuing narrative of events. See *People v. Cole*, 29 Ill. 2d 501, 504 (1963) (holding that evidence of a prior drug transaction was admissible because it "strengthened the identification of [the] defendant as the person with whom [the undercover police officer] dealt," "tended to remove any doubt that the defendant's conduct *** was inadvertent or innocent," and "showed the relationship between the parties"); *People v. Davis*, 248 Ill. App. 3d 886, 892 (1993) (holding that evidence of prior drug transactions was admissible to refute the defendant's claims that he did not personally sell the drugs on the date of the charged offense); *People v. Borawski*, 61 Ill. App. 3d 774, 779 (1978) (holding that evidence of prior drug transactions was admissible where it was "of value in showing the established relationship between the [defendant and the undercover officer]" and "strengthened [the] identification of [the] defendant"); *People v. Robinson*, 167 Ill. 2d 53, 65 (1995) (holding that other crimes evidence was admissible to prove identity under a theory of *modus operandi* where the first offense was "sufficiently similar to be probative on the issue of whether the defendant committed the [second offense]").

¶ 59 In this case, the trial court did not abuse its discretion in admitting evidence of the prior drug transaction on November 17, 2023. To be admitted as relevant other-crimes evidence, there must be "a 'threshold similarity' between the facts of the other-crimes evidence and the facts of the current offense." *Watkins*, 2015 IL App (3d) 120882, ¶ 47. The supreme court has established, however, that "some dissimilarity will always exist between independent offenses," and thus, any prior bad acts do not have to be "identical to the crime charged before evidence of them is admissible." *Illgen*, 145 Ill. 2d at 373. Indeed, in *Illgen*, the supreme court held that the

defendant's prior assault of his wife was sufficiently similar to his ultimately fatal assault of her, noting that "the fact that prior incidents of abuse did not involve the use of a gun is not particularly noteworthy," as "the prior assaults were probative of the defendant's motive and intent even though they did not cause the victim's death." *Illgen*, 145 Ill. 2d at 374-75. On this point, defendant argues that there was no evidence that he possessed a firearm during the November 17, 2023, transaction. Although this is true, the transactions were otherwise extremely similar: the undercover officer texted defendant to arrange a meeting and a sale of drugs, defendant drove the same vehicle, and they arranged to meet in the same location. The State did not have to prove that defendant was armed at both meetings to prove that there was a " 'threshold similarity' " between the transactions. *Watkins*, 2015 IL App (3d) 120882, ¶ 47.

¶ 60       The trial court was correct that the evidence of the November 17 transaction was admissible for the nonpropensity purposes of intent and knowledge. Defendant contends that admitting evidence of the prior drug transaction was error because there was no dispute about his identity or intent. When "deciding whether to admit other crimes evidence," the trial court "may consider whether the defendant is making an issue of intent or motive"; however, "a defendant cannot foreclose the prosecution from producing evidence of intent or motive through other crimes evidence simply by not presenting evidence or argument regarding intent or motive." *Davis*, 248 Ill. App. 3d at 892. After all, to prove that a defendant committed the crime of unlawful sale and possession of drugs, identity and guilty knowledge are "two elements to be proved by the People and there was no way of knowing what defense, if any, would be interposed." *Cole*, 29 Ill. 2d at 504. The State thus "cannot be required to confine this evidence of prior transactions to rebuttal since there may be no rebuttal if [the] defendant offers no evidence." *Cole*, 29 Ill. 2d at 504. More recently, in *Watkins*, the court held that "intent to deliver was a material issue in this case," contrary

to the defendant's argument on appeal, as it "was an element of the offense, and the State was obligated to prove that element beyond a reasonable doubt." *Watkins*, 2015 IL App (3d) 120882, ¶ 49. The court noted that "[a]lthough defense counsel did not directly attack that particular element of the offense, *** defense counsel did not in any way stipulate or concede in front of the jury that intent to deliver had been proven." *Watkins*, 2015 IL App (3d) 120882, ¶ 49.

¶ 61 In this case, although the prosecutor acknowledged at the hearing on the motion *in limine* that there was no issue as to defendant's identity, he also argued that the prior drug transaction was relevant to establishing intent, knowledge, *modus operandi*, and a continuing narrative of events. The trial court noted that identity and *modus operandi* were related. Defense counsel asserted that the State's "strongest argument would be as to intent" and "*modus operandi* is the State's weakest argument." The court pointed out that "intent's always at issue" and agreed that *modus operandi* was "the weakest argument here," while the "stronger ones relate to intent, knowledge, and then context." The State also responded that "[i]t's *** tough to say without knowing what the defense in this case is going to be as to, you know, how probative these things are," and "if the defendant's going to testify and say that wasn't me or that kind of stuff, it kind of changes the analysis."  The court recognized that defendant could indeed "hold off on that" and "make that argument later and [the State] wouldn't know till cross." Defense counsel eventually acknowledged that he "could argue it wasn't [defendant]," but considering the evidence, "identity is not an issue." Ultimately, the court admitted the evidence of the prior drug transaction to show defendant's intent and knowledge, as well as a continuing narrative, but reiterated that it "really [did not] see identity as an issue." During trial, when the evidence of the November 17 transaction was presented, the court clearly instructed the jury that "[t]his evidence is being received on the issues of the Defendant's intent and knowledge and may be considered for [*sic*] you only for that

limited purpose."

¶ 62         Although the parties and the trial court agreed that identity was not at issue, defendant did not concede before the close of evidence that intent to deliver had been proven. In fact, defense counsel acknowledged at the hearing on the motion *in limine* that the State's strongest argument in favor of admitting the evidence was intent. Furthermore, during cross-examination, defense counsel asked multiple officers if they had planted the drugs, along with the gun, in the car, suggesting he intended to contest defendant's intent or knowledge of the drugs' presence in his car. Defense counsel did ultimately concede during closing arguments that defendant was "guilty of selling a look-alike substance." However, although defendant argues on appeal, in hindsight, that intent was not at issue, the State needed to provide evidence during its case in chief of each element of the offense beyond a reasonable doubt and did not then know what defenses defendant would raise or concessions he would make. See *Cole*, 29 Ill. 2d at 504. Defendant cannot "foreclose the prosecution from producing evidence of intent or motive through other crimes evidence simply by not presenting evidence or argument regarding intent or motive." *Davis*, 248 Ill. App. 3d at 892. Here, defense counsel did not stipulate or concede that intent had been proven before the close of evidence and even hinted that he might intend to contest defendant's knowledge of the presence of the drugs in the car by asking police officers during cross-examination whether they had planted the drugs. Thus, whether defendant's intent was ultimately, in hindsight, at issue at trial cannot be dispositive of the court's ruling on the motion *in limine* before trial and the admission of the evidence before closing arguments were presented.

¶ 63         Furthermore, the State is correct that the other-crimes evidence was also necessary to explain the course of action culminating in the attempted drug transaction on December 8, 2023. Other-crimes evidence has often been deemed admissible for this purpose. See *Cole*, 29 Ill. 2d at

505 ("These prior transactions explain and lend credence to the otherwise unrealistic ease with which the Federal agent managed the controlled sale."); *Borawski*, 61 Ill. App. 3d at 779 (holding that evidence of prior drug transactions "was of value in showing the established relationship between the [defendant and undercover officer] and in explaining the ease with which [the undercover officer] was able to purchase the ritalin on the evening in question"). Defendant argues that any specific evidence about a previous transaction was unnecessary and cumulative of previously presented evidence. Importantly, however, there was no actual transaction that occurred on December 8, as the SWAT team surrounded and arrested defendant immediately after he arrived in the Walmart parking lot. As a result, context was needed to explain how officers knew defendant possessed and intended to sell drugs on that day. Without evidence of the November 17 transaction, there would be no explanation as to why officers were present in the Walmart parking lot to arrest defendant. The evidence of the November 17 transaction thus established the contact between defendant and the undercover officer, defendant's intent to sell the undercover officer drugs, the meeting location, and the vehicle defendant was driving, all of which were highly probative to explain the events of December 8. As a result, this case differs significantly from *People v. Lenley*, 345 Ill. App. 3d 399, 409 (2003), which defendant relies on heavily, where the court held that evidence of three prior crimes ascribed to, but not proven to be committed by, the defendant was not relevant to any nonpropensity purpose, as identity was the only issue and the evidence of the prior crimes was not probative of the defendant's identity.

¶ 64        Because the other-crimes evidence was admissible to establish defendant's intent, knowledge, and a continuing series of events, the trial court acted within its discretion by finding that the probative value of this evidence was not substantially outweighed by the prejudicial impact. The court carefully considered this balance and specifically excluded any references to

any transactions prior to November 17 to minimize the prejudicial impact and the possibility that a jury would use this evidence as propensity evidence. Additionally, the court specifically, clearly, and repeatedly gave the jury the appropriate limiting instruction, which reduces any prejudice created by admitting other-crimes evidence. See *Illgen*, 145 Ill. 2d at 376; *People v. Hayes*, 319 Ill. App. 3d 810, 820 (2001). The instruction prevented the jury from considering the evidence as evidence of defendant's propensity to commit a crime, and nothing in the record implies the jury considered the other-crimes evidence for anything other than its valid and limited purpose. Moreover, the State presented overwhelming evidence of defendant's guilt, thus negating an inference that evidence of the November 17 transaction was highly prejudicial or affected the result of the trial. Defense counsel admitted in closing arguments that defendant was guilty of possession with intent to deliver a look-alike substance; his only defense was that defendant did not possess the gun at issue in the charged offenses and that the police officers planted the gun in defendant's truck. As defendant points out, there was no evidence that he possessed a gun during the transaction on November 17, so that transaction was not propensity evidence on the issue of whether defendant possessed a gun on December 8.

¶ 65        Defendant argues that the evidence of the November 17 transaction was more prejudicial than probative because there was clearer evidence of that transaction than the December 8 transaction, as there was no body camera footage of any transaction on December 8. However, as the State points out, there was no video evidence of the December 8 transaction because no transaction occurred that day. That is precisely why the evidence of the November 17 transaction was critical to explaining the events of December 8. Moreover, the State is correct that defendant fails to cite any legal authority for his premise that evidence of other crimes is required to be less "clear" than that of the charged offense. There is some authority, not cited by defendant, that a

trial court should refrain from allowing the prosecution to "conduct a mini-trial" related to other-crimes evidence "for the sake of economy of judicial time," and thus "should carefully limit evidence of another crime to evidence that is relevant to the issue on which the other crime is admitted." (Internal quotation marks omitted.) *People v. Bartall*, 98 Ill. 2d 294, 315 (1983); see *Robinson*, 167 Ill. 2d at 66-67; *Watkins*, 2015 IL App (3d) 120882, ¶ 50.

¶ 66        Here, however, we cannot say the evidence presented on the November 17 transaction was so extensive and detailed that it rose to the level of being a "mini-trial" on whether defendant committed any offenses on a prior occasion. *Bartall*, 98 Ill. 2d at 315. Stevens briefly testified about her prior interactions and controlled buy from defendant on November 17, 2023, and the trial court admitted her body camera footage, which was an 11-minute video in total, with the transaction itself consisting of less than two minutes. The court also admitted the text messages between defendant and Stevens leading up to both transactions, which included two pages of texts regarding the November 17 transaction and two pages regarding the December 8 transaction. Logan also briefly testified that he surveilled the November 17 transaction, and the court admitted that footage, which was a two-minute video. There was no unnecessary, extraneous, or unrelated information provided. In comparison, as to the December 8 transaction, the jury heard either the testimony or stipulated testimony of eight witnesses for the State, saw short video recordings from Meyer's airplane surveillance and Moore's parking lot surveillance, and saw numerous photographs of the scene. Based on this record, there were no concerns about the court holding a "mini-trial" on issues unrelated to the charged offenses. *Bartall*, 98 Ill. 2d at 315.

¶ 67        For these reasons, the trial court did not abuse its discretion in finding that the evidence of the drug transaction between defendant and Stevens on November 17, 2023, was admissible to show defendant's intent, knowledge, and a continuing series of events necessary to

explain the context and prove the elements of the offense that occurred on December 8, 2023.

¶ 68    B. Double Enhancement for being an Armed Habitual Criminal

¶ 69    Defendant next contends that the trial court imposed an improper double enhancement when it considered one of the predicate felony offenses for the offense of being an armed habitual criminal as a factor in aggravation when sentencing him. He acknowledges that trial counsel did not object to the court's consideration of this predicate felony as a factor in aggravation, and thus, the issue is forfeited on appeal. Nevertheless, he argues this court should consider it under the plain-error doctrine, as the evidence at the sentencing hearing was closely balanced.

¶ 70    An unpreserved error may be considered on appeal under the plain-error doctrine if (1) "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Birge*, 2021 IL 125644, ¶ 24. The defendant bears the burden of persuasion under both prongs. *Birge*, 2021 IL 125644, ¶ 24. The first step under the plain-error doctrine is determining whether a clear or obvious error occurred. *Birge*, 2021 IL 125644, ¶ 24.

¶ 71    A defendant commits the offense of being an armed habitual criminal if he "receives, sells, possesses, or transfers any firearm after having been convicted a total of 2 or more times of any combination of the following offenses," including "unlawful possession of a weapon by a felon" and "any violation of the Illinois Controlled Substances Act or the Cannabis Control Act that is punishable as a Class 3 felony or higher." 720 ILCS 5/24-1.7 (West 2022). Here,

defendant stipulated that he had been convicted of two predicate offenses: unlawful delivery of a controlled substance in Peoria County in 2008 and being a felon in possession of a firearm in federal court in 2009.

¶ 72        In general, defendant is correct that "a factor implicit in the offense for which the defendant has been convicted cannot be used as an aggravating factor in sentencing for that offense." *People v. Phelps*, 211 Ill. 2d 1, 11 (2004). However, this court has previously held that when sentencing a defendant for the offense of being an armed habitual criminal, "though [the] defendant's prior [unlawful use or possession of a weapon by a felon (UUWF)] convictions were predicate offenses for the [armed habitual criminal] conviction, the trial court could consider them in the context of [the] defendant's criminal history," as " '[f]actors inherent in the offense can sometimes be considered, along with other factors in aggravation and mitigation, as part of the nature and circumstances of the case.' " *People v. Brown*, 2023 IL App (4th) 220476, ¶ 52 (quoting *People v. McGath*, 2017 IL App (4th) 150608, ¶ 73). This court thus agreed with the First District's decision that " 'while the *fact* of [defendant]'s prior UUWF conviction determined his eligibility for an [armed habitual criminal] charge, it is the *nature and circumstances* of that conviction which, along with other factors in aggravation and mitigation, determined the exact length of his sentence.' " (Emphases in original.) *Brown*, 2023 IL App (4th) 220476, ¶ 46 (quoting *People v. Brown*, 2018 IL App (1st) 160924, ¶ 21). In *Brown*, we explicitly rejected the defendant's invitation to apply the rationale of the Fifth District in *People v. Taylor*, 2022 IL App (5th) 180192, ¶¶ 54-55, where the court held that predicate felonies for being an armed habitual criminal should not be considered as aggravating factors during sentencing. *Brown*, 2023 IL App (4th) 220476, ¶ 51.

¶ 73        Defendant now urges us, under the plain-error doctrine, to reject our own decision

and the First District's in favor of adopting the Fifth District's approach. We decline to do so for the same reasons already explained in *Brown*, 2023 IL App (4th) 220476, ¶¶ 42-53, and in accordance with principles of *stare decisis*.

¶ 74 Under our reasoning in *Brown*, the trial court in this case properly considered defendant's previous convictions when determining the length of defendant's sentence. Importantly, "we presume that the court based its sentencing determination on proper legal reasoning, and we will consider the record as a whole, rather than focus on a few words or statements by the court." *Brown*, 2023 IL App (4th) 220476, ¶ 53. Here, the court explained that it had looked at the applicable case law and determined that although two of defendant's previous convictions were predicate offenses for the armed habitual criminal conviction, it was still permitted to view those offenses as part of defendant's entire criminal history. The State then presented evidence in aggravation regarding the specific circumstances of defendant's federal conviction of felon in possession of a firearm. In imposing its sentence, the court noted that it considered the conviction in "[t]he case with the gun at the federal courthouse and ski mask." The court's statement indicates that it considered the nature and circumstances of the offense—the location and details—rather than just the mere fact of the conviction. This was a proper sentencing consideration. *Brown*, 2023 IL App (4th) 220476, ¶ 53. Thus, under *Brown*, there was no error, let alone clear error.

¶ 75 Moreover, the trial court considered many other factors in aggravation, including the rest of defendant's extensive criminal history, that he committed many of these offenses while on pretrial release, that he had a history of fleeing from and eluding police, that at the age of 41 he had a scant employment history outside of dealing drugs, and that his rehabilitative potential was outweighed by all of these other facts. *Brown*, 2023 IL App (4th) 220476, ¶ 54. Thus, these

independent factors support the length of defendant's sentence.

¶ 76                          C. Sentencing Factors in Mitigation

¶ 77        Defendant argues that the trial court abused its discretion in finding no mitigating sentencing factors applied. Specifically, he contends the court failed to consider that he had two children whom he visited daily and would be negatively affected by his incarceration. He acknowledges this argument was not raised below and is thus forfeited. However, he contends it is reviewable under the first prong of the plain-error doctrine or as ineffective assistance of counsel, which provide exceptions to the general forfeiture rules.

¶ 78        "To establish ineffective assistance of counsel, a defendant must show (1) objectively unreasonable performance by counsel and (2) prejudice from that deficient performance." *People v. Fontanez-Marrero*, 2023 IL App (2d) 220128, ¶ 24. In turn, to establish first-prong plain error, a defendant must show that there was clear error and the evidence was closely balanced. *Birge*, 2021 IL 125644, ¶ 24.

¶ 79        " '[A] sentence within the statutory limits for the offense will not be disturbed unless the trial court abused its discretion,' which occurs when 'the trial court imposes a sentence that is greatly at variance with the spirit and purpose of the law, or is manifestly disproportionate to the crime.' " *People v. McGee*, 2020 IL App (2d) 180998, ¶ 8 (quoting *People v. Watt*, 2013 IL App (2d) 120183, ¶ 49). " 'A trial court has wide latitude in sentencing a defendant, so long as it neither ignores relevant mitigating factors nor considers improper factors in aggravation.' " *McGee*, 2020 IL App (2d) 180998, ¶ 8 (quoting *People v. Roberts*, 338 Ill. App. 3d 245, 251 (2003)). Importantly, "[t]he court is required to consider all factors in aggravation and mitigation." *McGee*, 2020 IL App (2d) 180998, ¶ 8.

¶ 80        In this case, defendant's conviction for being an armed habitual criminal was a

Class X felony (720 ILCS 5/24-1.7(b) (West 2022)), which subjected him to a sentence of between 6 and 30 years' imprisonment (730 ILCS 5/5-4.5-25(a) (West 2022)). His conviction for armed violence was a Class X felony with a special sentencing range (720 ILCS 5/33A-2(a), 33A-3(a) (West 2022)), which subjected him to a minimum term of imprisonment of 15 years (720 ILCS 33A-3(a) (West 2022)) and a maximum of 30 years (730 ILCS 5/5-4.5-25(a) (West 2022)). The trial court sentenced him to 24 years for being an armed habitual criminal and 26 years for armed violence, meaning his sentences were within the permissible ranges, and thus, presumptively proper. *McGee*, 2020 IL App (2d) 180998, ¶ 8.

¶ 81 The legislature recognized a mitigating sentencing factor relating to a defendant's parenting obligations under the following circumstances:

"The defendant is pregnant or is the parent of a child or infant whose well-being will be negatively affected by the parent's absence. Circumstances to be considered in assessing this factor in mitigation include:

(A) that the parent is breastfeeding the child;

(B) the age of the child, with strong consideration given to avoid disruption of the caregiving of an infant, pre-school or school-age child by a parent;

(C) the role of the parent in the day-to-day educational and medical needs of the child;

(D) the relationship of the parent and the child;

(E) any special medical, educational, or psychological needs of the child;

(F) the role of the parent in the financial support of the child;

(G) the likelihood that the child will be adjudged a dependent minor under Section 2-4 and declared a ward of the court under Section 2-22 of the Juvenile Court Act of 1987;

(H) the best interest of the child.

Under this Section, the defendant shall have the right to present a Family Impact Statement at sentencing, which the court shall consider in favor of withholding or minimizing a sentence of imprisonment prior to imposing any sentence and may include testimony from family and community members, written statements, video, and documentation. Unless the court finds that the parent poses a significant risk to the community that outweighs the risk of harm from the parent's removal from the family, the court shall impose a sentence in accordance with subsection (b) that allows the parent to continue to care for the child or children." 730 ILCS 5/5-5-3.1(a)(18) (West 2022).

¶ 82    Defendant asserts that the trial court abused its discretion when it found that there were "no factors relevant in this case in mitigation," as he claims that the factor in section 5-5-3.1(a)(18) applies. Neither the State nor defendant raised defendant's familial status or presented a family impact statement at the sentencing hearing. Instead, defendant's argument relies on two sentences from his PSI stating that "[h]e has two children, a daughter *** (20), and a son *** (9). He reported before his arrest that he saw both of his children daily. He reported he does not pay child support." The PSI does not specify where and with whom these children reside. Thus, we lack any information to evaluate the role defendant had in the "day-to-day educational and medical needs of the child[ren]," the relationship between him and his children, whether the children have "any special medical, educational, or psychological needs," or "the best interest of the child[ren]."

730 ILCS 5/5-5-3.1(a)(18)(C), (D), (E), (H) (West 2022). However, we do know from the report that he did not have a role "in the financial support of the child[ren]." 730 ILCS 5/5-5-3.1(a)(18)(F) (West 2022). The record does not show that this mitigating factor applied, so the court's findings with respect to the absence of mitigating factors were reasonable. See *People v. Haley*, 2025 IL App (5th) 240350-U, ¶ 32; *People v. Gregory*, 2025 IL App (4th) 240996-U, ¶¶ 210-213. As there was no error, there can be no clear error under the plain-error doctrine.

¶ 83        Defendant also argues that his counsel was ineffective for failing to argue that section 5-5-3.1(a)(18) applied as a factor in mitigation. Because there was no evidence to support the applicability of this factor beyond a bare assertion that defendant had children and saw them frequently, counsel's failure to raise this argument cannot be considered unreasonable or prejudicial. See *People v. Mister*, 2016 IL App (4th) 130180-B, ¶ 95 ("Defense counsel is not required to make futile motions or objections in order to provide effective assistance." (Internal quotation marks omitted.)).

¶ 84                              D. Rule 404(e) Waiver

¶ 85        Defendant lastly argues that his counsel was ineffective for failing to file an application for a waiver of assessments.

¶ 86        A criminal defendant has a constitutional right to effective assistance of counsel. U.S. Const. amend VI; *Strickland v. Washington*, 466 U.S. 668, 686 (1984). A defendant can demonstrate ineffective assistance of counsel by showing that "(1) the attorney's performance fell below an objective standard of reasonableness and (2) the attorney's deficient performance prejudiced the defendant in that, absent counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *People v. Jackson*, 2020 IL 124112, ¶ 90.

¶ 87 Illinois Supreme Court Rule 404 allows criminal defendants to apply for a waiver of court assessments under Section 124A-20(b) of the Code of Criminal Procedure of 1963 (725 ILCS 5/124A-20(b) (West 2024)) no later than 30 days after sentencing. Ill. S. Ct. R. 404 (eff. Sept. 1, 2023). Illinois Supreme Court Rule 404(e) (eff. Sept. 1, 2023) additionally provides,

> "In any case where a defendant is represented by a public defender, *** the attorney representing that defendant shall file a certification with the court, and that defendant shall be entitled to a waiver of assessments as defined in 725 ILCS 5/124A-20(a) without necessity of an Application under this rule."

¶ 88 In this case, defendant was represented by a public defender and thus Rule 404(e) establishes that his attorney "*shall* file a certification with the court" and defendant "*shall* be entitled to a waiver of assessments." (Emphases added.) Ill. S. Ct. R. 404(e) (eff. Sept. 1, 2023). Defense counsel thus was required by Rule 404(e) to file a certification for a waiver of defendant's felony assessments. See *People v. Yarber*, 2026 IL App (4th) 250294-U, ¶ 69. However, counsel failed to do so, and the trial court imposed $846 in fines and assessments. Defense counsel performed deficiently by failing to file a certification for a waiver of criminal assessments for defendant, as required by Rule 404(e), and counsel's failure prejudiced defendant because, had he done so, the assessments would have been waived. See *Yarber*, 2026 IL App (4th) 250294-U, ¶ 69; *People v. Fields*, 2026 IL App (4th) 250109-U, ¶ 99; *Glas*, 2025 IL App (4th) 241199-U, ¶¶ 34-35; *People v. Chase*, 2025 IL App (4th) 230407-U, ¶ 90. In similar cases, this court has remanded the case to the trial court for compliance with Rule 404(e). See *Yarber*, 2026 IL App (4th) 250294-U, ¶ 70.

¶ 89 The State responds that defendant's claim must be raised in the trial court under Illinois Supreme Court Rule 472(a)(1) (eff. Feb. 1, 2024), which requires claims of certain

sentencing errors, including "[e]rrors in the imposition or calculation of fines, fees, assessments, or costs," to be raised for the first time in the trial court. The parties thus agree that the case must be remanded to the trial court for defendant to have the opportunity to raise his claim for a waiver of assessments but disagree as to whether the proper procedural tool is Rule 404(e) or 472.

¶ 90　　　　As in *Yarber*, defendant does not assert that the trial court committed any error regarding fines, fees, assessments, and costs—rather, he contends only that his counsel failed to do something he was required by a supreme court rule to do. "Because the alleged (and actual) error is an omission of counsel, and not an error by the court, Rule 472 does not apply." *Yarber*, 2026 IL App (4th) 250294-U, ¶ 72; see *People v. Bogard*, 2026 IL App (4th) 250354-U, ¶¶ 71-78 (J. Doherty, concurring in part and dissenting in part). Thus, we remand the matter pursuant to Rule 404(e) with instructions for defense counsel to comply with Rule 404(e) and file a waiver of assessments on defendant's behalf. See *Yarber*, 2026 IL App (4th) 250294-U, ¶ 73; *Glas*, 2025 IL App (4th) 241199-U, ¶ 35; *Chase*, 2025 IL App (4th) 230407-U, ¶ 90.

¶ 91　　　　　　　　　　　　III. CONCLUSION

¶ 92　　　　For the reasons stated, we affirm the trial court's judgment and remand to provide defendant an opportunity to file an assessment waiver.

¶ 93　　　　Affirmed and remanded with directions.